In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 15-2857

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FUNDS IN THE AMOUNT OF $271,080,

*Defendant.*

Appeal of:

PEDRO CRUZ-HERNANDEZ and
ABRAHAM CRUZ-HERNANDEZ,

*Claimants.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 126 — **Joan B. Gottschall**, *Judge.*

---

ARGUED JANUARY 26, 2016 — DECIDED MARCH 17, 2016

---

Before WOOD, *Chief Judge,* and BAUER and POSNER, *Circuit Judges.*

WOOD, *Chief Judge.* When Chicago police officers searched a van registered to Pedro Cruz-Hernandez, they

found $271,080 in currency. They had a warrant that was based on a drug dog's alerting to the presence of drugs in the van, but they found no drugs. The government nonetheless initiated a civil forfeiture action against the money, contending that it was derived from, or had been used to facilitate, drug trafficking. Pedro and his brother, Abraham Cruz-Hernandez, contested the forfeiture, maintaining that they had lawfully earned the money. The district court entered summary judgment in favor of the government, and the brothers have appealed. We conclude that a jury reasonably could find that the government's evidence fails to establish, even by a preponderance, that the money is substantially connected to drug trafficking. We thus vacate the judgment and remand for further proceedings.

## I

Our story begins when Chicago police officers responded to an emergency call concerning a home invasion at the house where Pedro and Abraham lived with six others. In a bedroom of the house the police saw a handgun, a digital scale, and a small amount of marijuana in a baggie. A police drug dog signaled the presence of drugs in Pedro's van, which was parked outside the house. After obtaining a search warrant, the police discovered in the van a safe containing $271,080 in currency and two pages of handwritten notes including dates and numbers. The cash was bundled with rubber bands in stacks of $5,000. A second dog alerted to the safe. No drugs, however, were found in either the van or the safe.

The police interviewed Pedro after they found the money; Abraham was not present at the house that night. Pedro told them that armed intruders had broken into the house,

tied up the occupants, and demanded money and drugs. After the intruders had left, Pedro decided to move his brother's safe from the basement to the van in case they returned. He said that he did not know what was inside the safe but that his brother had told him it contained "important papers." Pedro maintained that the money was not his and that he did not know whose it was.

## II

The government apparently brought no criminal charges against the brothers or anyone else in the house, but it sought forfeiture of the money, see 21 U.S.C. § 881(a)(6), contending that it was proceeds of, or had been used or was intended to be used to facilitate, drug trafficking. Pedro and Abraham contested the forfeiture, see 18 U.S.C. § 983(a), and submitted affidavits attesting that the money is their joint savings from years of working and that they had not been involved in any criminal activity.

The government moved for summary judgment on two grounds. First, it argued that Pedro and Abraham lack the necessary ownership interest to establish standing to contest the forfeiture. See *United States v. Funds in the Amount of $239,400*, 795 F.3d 639, 645 (7th Cir. 2015). The government reasoned that the claimants had disavowed ownership of the money and thus had lost the ability to demonstrate standing. In support of this contention, the government pointed to Pedro's assertion to the police that he did not know whose money it was. The government also pointed to two alleged disavowals of ownership by Abraham: (1) a record created by U.S. Immigration and Customs Enforcement (ICE) six weeks before the police seized the safe, in which Abraham had said that he did not have any "equities" in the United

States, and (2) Abraham's application for cancellation of removal, filed with the assistance of immigration counsel six months after the seizure, in which he lists only $2,000 in "cash assets." The government represented that Pedro and Abraham, when deposed, had testified that they told the truth to the police and to immigration officials.

Second, the government maintained that even if the brothers have standing to challenge the forfeiture, a jury could not reasonably conclude that the evidence does not establish by a preponderance that the money is substantially connected to drug trafficking. That convoluted phrasing is necessary because in a civil-forfeiture action it is the government, as plaintiff, that bears the burden of proving the money's connection to drug trafficking; claimants must establish standing but are not required to prove "legitimate" ownership. See *$239,400*, 795 F.3d at 646. The government pointed to the circumstances in which the currency was found—in a safe to which a drug dog had alerted, bundled in stacks, along with the handwritten notes the government's lawyer called a "drug ledger," and near a house containing apparent drug paraphernalia. It also relied on tax records and the brothers' disclosures about their income, which the government argued was too low to permit the accumulation of such a large sum.

The brothers responded that their testimony of ownership is enough to establish standing. On the merits, they argued that the government was not entitled to summary judgment because a genuine dispute of fact exists about the connection of the money to drug trafficking. The government's attempt to base the necessary connection on the paraphernalia found in the house, they said, was undermined by

the facts that three other adults (and three minors whose ages we do not know) lived in the house and that no drugs or drug paraphernalia were found in the van or the safe. They further contended that the government had no evidence to show that the drug dog's alert to the safe was reliable. Nor did the government have any evidence that the supposed "ledger" had anything to do with drugs. And in any event, they said, the facts are contested: they testified that the handwritten notes relate to money sent to Mexico to build a home there, and they pointed to evidence that they earned the money legally and were not drug traffickers.

The district court initially denied the government's motion for summary judgment. It found that the brothers had standing to oppose the forfeiture. On the merits, it thought that their affidavits stating that they had not used or intended to use the money in drug trafficking but had earned it through work over many years created a genuine dispute about a connection between the currency and drug trafficking. Yet, in some tension with those observations, the court also opined that the brothers probably lacked sufficient evidentiary support to overcome summary judgment on "the merits of their claim of ownership" because of what the court characterized as their previous disavowals of ownership. It ordered the brothers to show cause why summary judgment should not be entered for the government because of a "lack of evidentiary support for their ownership claim."

In response the brothers submitted a memo supported by two additional affidavits. Pedro explained his disavowal of ownership to the police by adding that he had given his cash savings to Abraham and had not known exactly where Abraham kept the money. Abraham swore that when he

listed his "cash assets" on the application for cancellation of removal the police were in possession of the money and he did not realize that his legal claim to money he did not physically possess counted as a "cash asset."

Based on this record, the district court granted summary judgment for the government. It found that the additional affidavits submitted by the brothers were inconsistent with their prior sworn testimony. Pedro's second affidavit contradicted, in the court's view, his deposition testimony indicating that he had learned from Abraham on the night of the seizure that his money was in the safe. And because Abraham had been represented by counsel when he applied for cancellation of removal, the court discredited his affidavit testimony that when completing the application he had not understood his legal claim to the money to be a "cash asset." Invoking the "sham-affidavit" rule, see *United States v. Funds in Amount of One Hundred Thousand One Hundred & Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013), the court concluded that the affidavits did not create a genuine dispute of fact regarding the brothers' ownership. The court ended by concluding that the government had "pointed to substantial circumstantial evidence indicating that the claimants' interest in the money is not legitimate and that the money is connected to criminal activity."

## III

On appeal the brothers first argue that it was error for the district court to invoke the sham-affidavit rule to discredit their second affidavits explaining their earlier statements. Relying on *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 750–51 (7th Cir. 2010), they argue that the sham-affidavit rule applies only when a change in testimony is "incredible and

unexplained." We agree with the brothers that the sham-affidavit rule was misapplied here. We have emphasized that, in light of the jury's role in weighing credibility, this rule is to be used with "great caution." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1169 (7th Cir. 1996). The rule "is designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised." *McCann*, 622 F.3d at 751. Changes in testimony normally affect the witness's credibility rather than the admissibility of the testimony, and thus the sham-affidavit rule applies only when a change in testimony "is incredible and unexplained," not when the change is "plausible and the party offers a suitable explanation such as confusion, mistake, or lapse in memory." *Id*. (quotation marks and citation omitted); accord *Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015); *Patton v. MFS/Sun Life Fin. Distribs., Inc*., 480 F.3d 478, 488 (7th Cir. 2007); *Commercial Underwriters Ins. Co. v. Aires Envtl. Servs., Ltd*., 259 F.3d 792, 799 (7th Cir. 2001).

Abraham's explanation for his answer on the immigration form is not only plausible, but is *correct*. We suspect that many people—in particular immigrants completing a form for ICE—would not be aware that a legal claim is an asset. But whether they would or not, a legal claim—even a claim to money—is not itself a "cash asset." See CASH, Black's Law Dictionary (10th ed. 2014) (defining cash as "1. Money or its equivalent; 2. Currency or coins, negotiable checks, and balances in bank accounts."). Moreover, when deposing Abraham the government's lawyer did not ask about his understanding of a "cash asset" or whether his attorney had explained the definition of that term. There is no reason, therefore, to reject out-of-hand Abraham's deposition testimony that he had been truthful in his immigration filings.

Pedro's explanation for any perceived contradictions in his testimony also is plausible. Contrary to the district court's conclusion, Pedro's affidavit testimony that he did not know where Abraham kept his money does not *necessarily* contradict his deposition testimony that he learned the night of the seizure that his money was in the safe. His affidavit may mean only that he was unaware of the money's location until Abraham informed him that it was in the safe. Pedro's affidavit testimony can be read as a plausible explanation of his denial of ownership to the police. Pedro testified at his deposition that before the police arrived Abraham had spoken to him on the phone and said there were "important papers" in the safe. The government later asked if Pedro had learned from his brother that night that it was his money in the safe and Pedro answered yes. The government never clarified, however, whether Pedro learned that it was his money during that same conversation with Abraham (before the police came) or in a second conversation later that night (after Pedro's interview with the police). If it was later that night, then Pedro never knowingly disavowed ownership to the police and thus made no contradictory statements in any sworn testimony. In any event, the currency was found in Pedro's possession, and in his various statements there are no "contradictions so clear that the only reasonable inference was that the affidavit was a sham designed to thwart the purposes of summary judgment." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015).

The second issue on appeal is whether the district court erred in requiring the brothers to prove ownership beyond what is necessary for standing. Relying on *Funds in the*

*Amount of $239,400*, 795 F.3d at 645, they argue that the district court impermissibly shifted the burden of proof from the government to them by requiring them to prove legitimate ownership and granting summary judgment to the government when it concluded that they could not.

Again we agree with the brothers. Once a claimant has submitted evidence establishing standing, the burden shifts to the government as plaintiff to prove by a preponderance of the evidence that seized assets are subject to forfeiture. See *Funds in the Amount of $239,400*, 795 F.3d at 645–47. Requiring a claimant to demonstrate legitimate ownership is "tantamount to demonstrating that property is not subject to forfeiture," and is an impermissible shifting of the burden of proof. *Id.* at 646 (internal quotation marks and citation omitted); see also *United States v. $557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 77, 79 (2d Cir. 2002); *United States v. Borromeo*, 995 F.2d 23, 26 (4th Cir.), *modified in unrelated part on pet. for reh'g*, 1 F.3d 219 (4th Cir. 1993). We do not dispute that there are situations in which claimants must prove ownership beyond the requirements of standing. For example, once the government has met its burden of proving the property is subject to forfeiture, a claimant may raise the defense of being an innocent owner (in other words, that he did not know about the illegal use of his property), and in that case the burden shifts to the claimant to prove legitimate ownership. See *United States v. 5 S 351 Tuthill Rd., Naperville, Ill.*, 233 F.3d 1017, 1026 (7th Cir. 2000). But this is not such a case.

Finally, we think a jury reasonably could find that the government failed to meet its burden of proving by a preponderance of the evidence that this money is substantially

connected to drug trafficking. There is evidence in the record that supports the brothers' testimony that they earned the money legally. They documented income since 2000 that between them totaled just over $680,000. After subtracting the money found in the safe and all other expenses described in their depositions and other records, the brothers had approximately $320,214—roughly $1,026 each per month—left to cover living expenses. The government pointed to no evidence suggesting that any of the brothers' evidence of income is fabricated or that they have lavish spending habits. Because the brothers realistically could have saved the $271,080 at issue, there is a genuine dispute of fact that precludes summary judgment for the government. See *$100,120.00*, 730 F.3d at 718–19; *United States v. $11,500.00 in U.S. Currency*, 710 F.3d 1006, 1013–15 (9th Cir. 2013); *cf. United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars ($30,670.00)*, 403 F.3d 448, 455–70 (7th Cir. 2005) (affirming grant of summary judgment largely because seized funds plus claimant's documented expenditures exceeded his stated income).

It is also telling that the government has presented virtually no evidence that the brothers are involved in drug trafficking. There was nothing to indicate past or current drug dealing by the brothers or anyone else living with them in the house, nor was there any suggestion that either brother used the bedroom where the apparent drug paraphernalia was found. Though drug dogs had alerted to the safe and currency, the government did not submit to the court any evidence of the dogs' training, methodology, or field performance. See *United States v. Ten Thousand Seven Hundred Dollars & No Cents ($10,700.00) in U.S. Currency*, 258 F.3d 215, 230 (3d Cir. 2001) (deciding that because government pre-

sented no evidence of particular dog's training and accuracy there was no record basis for concluding that drug dog's alert bolsters the government's case). Neither did the government point to evidence (*e.g.*, an experienced drug investigator's opinion) to substantiate its assumptions that the notes found in the safe were a "drug ledger" or that counting and bundling currency is something that only drug dealers would do. "Absent other evidence connecting the money to drugs, the existence of money or its method of storage are not enough to establish probable cause for forfeiture," much less enough to meet the now-heightened standard of a preponderance of the evidence. *United States v. $506,231 in U.S. Currency*, 125 F.3d 442, 452–54 (7th Cir. 1997); *$10,700*, 258 F.3d at 232–33.

Courts have concluded that the government failed to meet its burden in cases with better evidence than this of alleged drug connections. See *$506,231*, 125 F.3d at 52–54 (overturning grant of summary judgment for government where large amount of currency was "unusually" stored at pizzeria, drug dog had alerted to currency, and informant had reported that cocaine was delivered to pizzeria because, taken together, this evidence could not establish probable cause to believe that money was connected to drug trafficking); *$10,700*, 258 F.3d at 227–33 (concluding that government had not met burden where drug dog had alerted to, and chemical tests showed, drug residue on large amounts of currency found in bundled stacks in car rented by men with drug convictions because no drugs were found in car, government had submitted no evidence that men currently were involved in drug trafficking, and government had not submitted comparative evidence of drug dog and chemical test reactions to currency in general); *United States v.*

*$5000.00 in U.S. Currency*, 40 F.3d 846, 848–49 (6th Cir. 1994) (concluding that government had not met burden when two men, one matching informant's description of drug dealer and the other having prior convictions for drug trafficking, were found with large amount of bundled currency, drug dog had alerted to currency, and men had flown to New York for single day).

There is a genuine dispute over whether the money in this case is substantially connected to drug trafficking; a jury reasonably could believe that the government has failed to meet its burden to prove that connection. Accordingly, we VACATE the judgment and REMAND for further proceedings.