In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 16-3238

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FUNDS IN THE AMOUNT OF
ONE HUNDRED THOUSAND
AND ONE HUNDRED TWENTY
DOLLARS ($100,120.00),

*Defendant.*

APPEAL OF:

NICHOLAS P. MARROCCO AND
VINCENT J. FALLON.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 03 C 03644 — **John J. Tharp, Jr.**, *Judge.*

———————————

ARGUED MAY 31, 2018 — DECIDED AUGUST 22, 2018

———————————

Before FLAUM, MANION, AND HAMILTON, *Circuit Judges.*

MANION, *Circuit Judge*. In December 2002, law enforcement seized $100,120 in United States currency from a passenger on an Amtrak train. The federal government initiated a civil forfeiture proceeding against the currency. The passenger and the owner of the funds, neither of whom were ever charged with committing any crime related to the funds, joined the suit as claimants. After fourteen years and two appeals, the case went to a jury. The jury found the currency was substantially connected to a drug transaction and entered a verdict for the government. The claimants filed multiple post-trial motions, all of which the district court denied. The case now comes to us for the third time. We affirm.

## I.

### A. Background

"Because a jury has rendered a verdict, we view the evidence in the light most favorable to that verdict." *Matthews v. Wis. Energy Corp.*, 642 F.3d 565, 567 (7th Cir. 2011).

On December 6, 2002, Officer Eric Romano of the Amtrak Police (a member of the Drug Enforcement Administration Chicago Transportation Interdiction Taskforce) arrived at work at Union Station in Chicago and pulled up the manifests for the long-distance trains leaving that day. One reservation that caught his eye was Vincent Fallon's. Fallon was traveling to Seattle, a city Officer Romano knew as a source for drugs. Also, Fallon had used cash to purchase a one-way ticket, with a private bedroom, only two days earlier. Because Fallon's conduct fit a drug-courier profile, Officer Romano decided to question him.

Officer Romano and Officer Sterling Terry of the Chicago Police Department approached Fallon in his bedroom on the

train. Officer Romano noticed Fallon had two bags: a duffel bag and a briefcase. After introducing himself, Officer Romano asked Fallon why he was traveling to Seattle. Fallon said he was going to see "a lady friend." Officer Romano asked Fallon if he was carrying weapons, drugs, or large amounts of currency. Fallon responded he was not.

The conversation turned to Fallon's bags. Officer Romano asked Fallon what was inside the briefcase, which was locked. Fallon, who was sweating and trembling, said it contained personal items and that he had packed it, but he did not have a key. When pressed on its contents, Fallon said the briefcase contained $50,000. Officer Romano asked him again why he was going to Seattle, and this time Fallon said he was potentially going to put a down payment on a house.

Officer Romano decided he was going to take the briefcase for further investigation at the Amtrak Police office. A drug dog was summoned. Before it arrived, Officer Romano opened the briefcase and observed it contained United States currency. When the dog arrived, Officer Romano spoke with the dog's handler and hid the briefcase in the office's roll-call room. The handler gave the dog the instruction to "fetch dope," and the dog ultimately found and alerted on the briefcase. Officer Romano picked the bag up from the floor, and he and Officer Terry counted out nineteen bundles of cash. They placed the cash in an evidence bag and handed Fallon, who had accompanied them to the office, a receipt. Fallon was then free to go.

The money was taken to the DEA headquarters in Chicago and placed in an evidence vault. The seizure had taken place on a Friday, so on the following Monday Officers Romano and Terry took the currency to LaSalle National Bank to have

it counted. The bank counted out $100,120 and issued a cashier's check to the government in that amount. The physical currency was not retained.

**B. Procedural History**

On May 28, 2003, the United States filed a civil complaint seeking forfeiture of the funds. Fallon and Nicholas Marrocco, the undisputed actual owner of the funds, joined the action as claimants. More than five years after the government filed its complaint, the case found its way to us for the first time. The district court had suppressed the currency and the results of the dog sniff as evidence acquired in violation of the Fourth Amendment, and the government appealed. We reversed. *United States v. Marrocco*, 578 F.3d 627, 642 (7th Cir. 2009).

Back in the district court, the claimants moved to have the dog-sniff evidence excluded from consideration on spoliation grounds. The claimants argued the government had intentionally destroyed the currency in bad faith when it converted the currency to a cashier's check, thus depriving the claimants of the opportunity to perform chemical tests to determine the presence or absence of drugs. Judge Bucklo denied the motion, calling it "without merit." Judge Bucklo accepted the government's contention that the officers had deposited the currency in conformity with a Department of Justice policy not to hold large amounts of cash, so she found no bad faith. Additionally, she questioned what good chemical testing would have done for the claimants because they were already arguing that *all* currency is tainted with trace amounts of narcotics.[1]

---

[1] *See generally* Mark Curriden, *Courts Reject Drug-Tainted Evidence*, 79-Aug. A.B.A.J. 22, 22 (1993) (discussing a 1985 Miami Herald study

The district court granted summary judgment to the government, and the claimants appealed. While they did raise their Fourth Amendment suppression argument from the first appeal, they did not raise the spoliation issue. We reversed summary judgment, concluding that genuine issues of material fact existed about how Marrocco allegedly accumulated the money and the reliability of the dog sniff. *United States v. $100,120*, 730 F.3d 711, 727 (7th Cir. 2013).

On remand, the case, now assigned to Judge Tharp, moved toward trial. In anticipation of trial, the claimants submitted another spoliation motion, asking Judge Tharp to bar the government from presenting evidence relating to the dog sniff or at the least to give a spoliation instruction to the jury.

Unlike Judge Bucklo, Judge Tharp agreed with the claimants that the government had destroyed the currency in bad faith. He rejected the government's assertion that it was only following a policy, finding no policy "that currency with evidentiary value should be deposited in banks rather than be preserved as evidence." Nevertheless, he did not bar the government from presenting the dog-sniff evidence, nor did he agree to give a spoliation instruction to the jury, because he felt constrained by the law-of-the-case doctrine. Because Judge Bucklo had concluded there was no spoliation, and the claimants had not contested that decision in their appeal of summary judgment, Judge Tharp held the claimants had "forfeited any right to subsequently challenge that ruling," and denied the motion.

---

that discovered $20 bills submitted by Janet Reno, Jeb Bush, and a former Miss America, among others, "were tainted by significant traces of cocaine").

The trial began on January 25, 2016. In the government's case in chief, the jury heard testimony from Officer Romano about the events of December 6, 2002, which we recounted above. The jury also heard testimony on drug-dog training and testimony that the drug dog involved in this case had a perfect record in 116 searches, including a failure to alert to currency not tainted with drugs.

The government also called Marrocco to the stand. He testified the money was his—the result of saving cash he had earned working various jobs. But the government presented evidence suggesting that, based on his income as stated on tax documents and his expenses as stated in a discovery response, he could not have saved that much money. He claimed to have kept the money as cash because he did not have a bank account. He testified that credit-card issues from when he was in college (he was thirty-two years old at the time of the seizure) had prevented him from opening an account.

About why he put his purported savings in Fallon's hands to take to Seattle on a train, Marrocco said he wanted to invest in a restaurant or bar on the West Coast. He testified there were "specific places" he was looking at, but said nothing more definite than that. Marrocco testified he put $127,000 in the briefcase and gave it to Fallon the day before the seizure. The plan was for Fallon to take the money to Seattle and place it in a safety-deposit box. Marrocco, who had never himself traveled by train, said he chose to send the money by train because cars can break down and flying could result in delays.

At the close of the government's case, the claimants made a motion for judgment as a matter of law,[2] which the court denied. The claimants then put on their case. The claimants presented testimony from Dr. Lawrence Myers, the founder and director of the Institute for Biological Detection Systems at Auburn University, and David Kroyer, a dog trainer from Texas. Both questioned the reliability of the drug dog's alert. Marrocco also testified, again claiming the money was the fruit of years of saving.

Before closing arguments, the court instructed the jury. The instructions stated the government was required to prove by a preponderance of the evidence that the $100,120 was substantially connected to an unlawful drug transaction. The instructions also stated the government was not required to prove a connection to a specific drug transaction, only a connection to "some" transaction, and the government was not required to prove the claimants themselves were involved in any unlawful conduct.

After the jury received its instructions, the parties made closing arguments and the court submitted the case to the jury. Despite a request from the claimants, the court did not provide the jury with a special verdict form with interrogatories.

---

[2] The claimants refer to this motion and their post-trial renewal as a motion for a directed verdict and a motion for judgment notwithstanding the verdict, respectively. The Rules no longer use those terms, instead using "motion for judgment as a matter of law" and "renewed motion for judgment as a matter of law." Fed. R. Civ. P. 50(a)(2), (b); *see also* Fed. R. Civ. P. 50(a) advisory committee's note to 1991 amendment ("If a motion is denominated a motion for directed verdict or for judgment notwithstanding the verdict, the party's error is merely formal.").

At some point in the deliberations, the jury, presumably prompted by the claimants' suggestions during the trial that the currency should have been submitted to a laboratory for testing, sent the court the following question: "Did the CPD and Amtrack [sic] Police follow 'proper procedures' (in 2002) related to a drug-related confiscation? Or—were they required to send suspected items to a crime lab?" The claimants believed the jury was asking a single question relating to whether the government should have had the currency chemically tested, and they requested an instruction simply telling the jury it had received all of the evidence. The court, at the prompting of the government and over the objection of the claimants, interpreted the note as asking two questions: one question relating to the legal appropriateness of the officers' stop and seizure of Fallon and the briefcase, the other question referring to whether the officers should have submitted the currency for testing. The court's response stated,

> The question of whether "the CPD and Amtrak Police follow[ed] 'proper procedures' (in 2002) related to a drug related-confiscation" is a legal issue that is not relevant to your determination of whether the funds are subject to forfeiture. As to whether they were "required to send suspected items to a crime lab?" you have received all of the evidence in this case. You must decide this case based upon the evidence heard in Court.

The jury returned a verdict for the government. After the trial, the claimants renewed their previously denied motion for judgment as a matter of law, requested a new trial, and in the alternative, requested a determination that the forfeiture

of the whole $100,120 was constitutionally excessive. The district court denied all of those motions. The claimants appealed, bringing the case to this court for the third time.

## II.

**A. New Trial**

We address first the claimants' motion for a new trial. Federal Rule of Civil Procedure 59 allows a court to order a new trial "if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014). We will address the question of the weight of the evidence when discussing the claimants' motion for judgment as a matter of law, so we focus here on whether the trial was unfair to the claimants. The claimants raise four arguments in that regard: the court should have given a spoliation instruction, the jury instructions the court did give confused the jury, the court's answer to the jury's question was misleading, and the court should have used a verdict form with interrogatories. We address each in turn.

### 1. Spoliation

The proverbial 800-pound gorilla in this case is the spoliation issue. A district court may direct a jury to infer evidence was unfavorable to a party if that "party intentionally destroy[ed] [the] evidence in bad faith," that is, "for the purpose of hiding adverse information." *Bracey v. Grondin*, 712 F.3d 1012, 1018–19 (7th Cir. 2013) (quoting *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008)). The claimants maintain that is what happened in this case: the government converted the seized currency to a cashier's check to prevent the claimants from performing chemical tests for the presence of drugs

on the currency.[3] The government counters that it was only following a Department of Justice policy not to hold large amounts of cash.

When the claimants raised this issue before trial, Judge Tharp agreed with the claimants but felt constrained by Judge Bucklo's earlier ruling, which the claimants had not challenged in their appeal of the grant of summary judgment. The claimants argue Judge Tharp was wrong; he should not have felt himself so limited. The claimants cite *Menzer v. United States*, 200 F.3d 1000, 1004 (7th Cir. 2000), in which this court stated "[t]he law of the case doctrine does not bar a trial court from revisiting its own evidentiary rulings." The claimants argue Judge Bucklo's spoliation decision was an evidentiary one, and so Judge Tharp was free to reconsider it.

The claimants' reliance on *Menzer* is misplaced. There, the trial court ruled the government could not introduce evidence of the defendant's prior conviction for sexual exploitation. *Id.* at 1004 & n.3. Nevertheless, that evidence was introduced and the court declared a mistrial. *Id.* at 1004 n.3. The government obtained a new indictment and tried the defendant again. *Id.* at 1002. This time, the court[4] allowed the evidence of the defendant's prior conviction. *Id.* at 1004 n.3. A jury convicted the

---

[3] The claimants also contend the destruction of the currency prevented them from using the serial numbers on the bills to show Marrocco acquired them over a long period of time. But the claimants raised this theory for the first time in their post-trial Rule 59 motion. Consequently, the district court declined to consider it, and so do we. *See King v. Cooke*, 26 F.3d 720, 726 (7th Cir. 1994) (noting Rule 59 motions may not be used "to present new theories").

[4] Similar to the situation in this case, the defendant's second trial was assigned to a different judge. *Menzer*, 200 F.3d at 1004 n.3.

defendant. *Id.* at 1002. In his post-conviction proceeding, the defendant "argue[d] that his counsel was ineffective for failing to raise the law of the case doctrine to preclude the trial judge from revisiting his decision to exclude" the evidence of the prior conviction. *Id.* at 1004 (footnote omitted). We determined counsel was not ineffective for failing to raise law of the case in that circumstance "[b]ecause the Government did not appeal the evidentiary ruling excluding [the defendant's] prior conviction" so "the trial judge was free to revisit this ruling in [the defendant's] second trial." *Id.* at 1005.

Here, unlike in *Menzer*, there was an appeal. After Judge Bucklo ruled against the claimants on their spoliation argument, she entered summary judgment for the government. The claimants appealed that grant of summary judgment to this court. As an appeal from a final judgment, that appeal brought "up for review any interlocutory order that ha[d] not become moot." *Taylor v. Brown*, 787 F.3d 851, 856 (7th Cir. 2015) (quoting *Chicago Bd. of Educ. v. Substance, Inc.*, 354 F.3d 624, 626 (7th Cir. 2003)). Nevertheless, the claimants did not challenge Judge Bucklo's spoliation ruling in that appeal. This is surprising, as a decision in their favor on that issue would have struck a potentially fatal blow to the government's case. But by failing to raise the issue when they had every reason to do so, they implicitly acquiesced to Judge Bucklo's decision, and thus waived their claim. *See, e.g.*, *United States v. Zahursky*, 668 F.3d 456, 459 (7th Cir. 2012) (criminal defendant who won remand of sentence on one guideline issue could not raise on remand other guideline issues that could have been raised in earlier appeal); *Fed'n of Advert. Indus. Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 929 (7th Cir. 2003) (party could not revive damages claim after remand when it

failed to raise issue in earlier appeal); *see also Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011) ("[A]n issue that could have been but was *not* raised on appeal is forfeited and may not be revisited by the district court on remand.").[5] Accordingly, Judge Tharp correctly concluded the claimants could not challenge Judge Bucklo's decision on spoliation and therefore, regardless of his own view of the government's conduct, he did not err in refusing to bar the dog-sniff evidence.[6]

### 2. The Jury Instructions

"We review *de novo* whether a challenged jury instruction fairly and accurately summarized the law … ." *Paldo Sign and Display Co. v. Wagener Equities, Inc.*, 825 F.3d 793, 796 (7th Cir.

---

[5] Judge Tharp discussed his ruling in terms of law of the case doctrine rather than waiver. These doctrines are often confused. *See Med. Ctr.*, 634 F.3d at 834; 18B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4478.6 (2d ed.); *see also Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995) ("Our occasional shorthand suggestion that the trial court's decision becomes 'law of the case' for the appellate court is technically inaccurate."). Waiver "differs from the law-of-the-case doctrine in that it arises as a consequence of a party's inaction, not as a consequence of a decision on our part." *Med. Ctr.*, 634 F.3d at 834 (quoting *United States v. Castillo*, 179 F.3d 321, 326 (5th Cir. 1999)). In any event, we agree with Judge Tharp here. "Regardless of nomenclature…if an issue was decided by the district court but was not appealed, the issue is forfeited, and the district court may not reconsider the issue on remand." *Id.* at 834 n.3.

[6] We also note that Judge Bucklo's decision precluded giving a spoliation instruction to the jury because she had unequivocally determined the government had not acted in bad faith. There was no dispute of fact for the jury to resolve.

2016). Even if we determine the instructions given were erroneous, the movant must also prove "he was prejudiced by the error because the jury was likely to be misled or confused." *Rapold v. Baxter Int'l Inc.*, 718 F.3d 602, 609 (7th Cir. 2013). To determine whether the instructions were "potentially confusing or misleading," we "examin[e] the instructions as a whole" to see "if the correct message was conveyed to the jury reasonably well." *Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 433 (7th Cir. 2009) (internal quotation marks omitted) (quoting *Dawson v. N.Y. Life Ins. Co.*, 135 F.3d 1158, 1165 (7th Cir. 1998)).

The claimants focus their attack on the interplay between three instructions. The claimants do not contest the first instruction, the "elements instruction," which

> requir[ed] the jury to find both a substantial connection between the funds and an unlawful controlled substance *and* that the funds were (1) furnished or intended to be furnished in exchange for a controlled substance; (2) the proceeds from the sale of a controlled substance; or (3) monies used or intended to be used to facilitate a controlled substances transaction.

*United States v. $100,120*, No. 03 C 03644, 2016 WL 3459527, at *2 (N.D. Ill. June 24, 2016); *see also* 21 U.S.C. § 881(a)(6) (making subject to forfeiture "[a]ll moneys … furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys … used or intended to be used to facilitate any violation of this subchapter."). Instead, their dispute is with two instructions that followed the elements instruction: the

"transaction" instruction and the "offense" instruction. The transaction instruction stated the "government did not need to link the funds to a specific controlled substance transaction at a given time and place, but only to some unidentified unlawful controlled substance transaction." *$100,120*, 2016 WL 3459527, at *7. The offense instruction told the jury "the government was not required to prove that the claimants committed a controlled substance offense and that the fact the claimants did not directly participate in illegal activity is not a defense to the forfeiture." *Id.*

The claimants contend the transaction and offense instructions confused the jury, but we are not convinced. The transaction instruction accurately stated the law: the government was not required to prove the existence of a specific drug transaction. *See United States v. $242,484*, 389 F.3d 1149, 1160 (11th Cir. 2004) (en banc). It is enough that the government showed a connection to *some* transaction—the details are not necessary.

Turning to the offense instruction, the claimants maintain it conflicts with the "innocent owner" defense to forfeiture. Put simply, if a claimant can show he is an "innocent owner (in other words, that he did not know about the illegal use of his property)," he can avoid the forfeiture. *United States v. $271,080*, 816 F.3d 903, 908 (7th Cir. 2016). The claimants argue the offense instruction negates that defense by stating the government need not prove the claimant was personally involved in any criminal activity, and so it confused the jury and there should be a new trial.

The claimants are wrong. First, the instruction is generally correct in that the government need not prove a claimant's culpability for unlawful conduct to obtain a forfeiture. Civil

forfeiture is a proceeding *in rem*, wherein the "inanimate [property] is treated as being itself guilty of the wrongdoing, regardless of its owner's conduct." *United States v. One 1976 Mercedes Benz 280S*, 618 F.2d 453, 454 (7th Cir. 1980). And even where the innocent owner defense is raised, it is the *claimant's* burden to prove his innocence, not the government's to prove his guilt. *See* 18 U.S.C. § 983(d)(1) ("The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence."). Second, the claimants were not prejudiced here because they never raised the inno-cent-owner defense at trial—their argument all along was that the funds were not related to an unlawful drug transaction, not that they were innocent owners of corrupted currency. Not having raised the defense, they cannot claim to be preju-diced by the instruction.

The instructions told the jury to determine whether the money was substantially connected to some unlawful drug transaction and fit within certain statutory categories, regard-less of the claimants' personal participation (or lack thereof) in any such drug transaction. That was not confusing.

*3. The Jury Question*

"We review the court's response to [a jury] question for abuse of discretion." *Morgan v. City of Chicago*, 822 F.3d 317, 342 (7th Cir. 2016). In doing so, we ask "whether the response: (1) fairly and adequately addressed the issues; (2) correctly stated the law; and (3) answered the jury's question specifi-cally." *Stevens v. Interactive Fin. Advisors, Inc.*, 830 F.3d 735, 741 (7th Cir. 2016). As we do when evaluating other instructions given to the jury, we reverse only if the response resulted in prejudice. *United States v. Carani*, 492 F.3d 867, 874 (7th Cir. 2007).

The claimants argue the court's response to the jury's question essentially told the jury to disregard the fact the currency was not submitted to laboratory testing. We disagree. While the court's interpretation of the question as two questions is suspect, the district court's answer was not an abuse of discretion. The answer delineated between legal and factual issues. It told the jury to ignore a legal issue concerning "procedures," and, far from telling the jury to ignore that the currency was not sent for testing, the answer simply states, "As to whether they were 'required to send suspected items to a crime lab?' you have received all of the evidence in this case. You must decide this case based upon the evidence heard in Court." That told the jurors they had to make up their own minds. There was no abuse of discretion.

*4. Interrogatories*

We may dispose of the interrogatories issue quickly. "Whether to 'submit special interrogatories [to the jury]…is committed to the sound discretion of the district court.'" *E.E.O.C. v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 439 (7th Cir. 2012) (quoting *Cruz v. Town of Cicero*, 275 F.3d 579, 591 (7th Cir. 2001)). We have said their use is "particularly advisable in" complex cases, "such as … where multiple complicated and interrelated claims are submitted to a jury after a five week trial." *Huff v. Sheahan*, 493 F.3d 893, 904 n.14 (7th Cir. 2007). This is not one of those cases. The issue was very straightforward: whether the currency was substantially connected to an unlawful drug transaction in one of the three ways identified by the statute. It was not an abuse of discretion not to use interrogatories here.

**B. Judgment as a Matter of Law**

Federal Rule of Civil Procedure 50(a) allows a court to enter judgment against a party at the close of that party's case in chief in a jury trial if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party." If, as happened here, the court denies that motion, "the movant may file a renewed motion for judgment as a matter of law," after trial. Fed. R. Civ. P. 50(b).

We "conduct[] a *de novo* review of a district court's decision" on a motion for judgment as a matter of law. *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 859 (7th Cir. 2007). We "examin[e] the record as a whole to determine whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, was sufficient to support the jury's verdict." *Walker v. Bd. of Regents of Univ. of Wis. Sys.*, 410 F.3d 387, 393 (7th Cir. 2005) (quoting *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1173 (7th Cir. 2002)). This is "a highly charitable assessment of the evidence." *May v. Chrysler Grp., LLC*, 716 F.3d 963, 971 (7th Cir. 2013). And we will "reverse the verdict only if … no rational jury could have found for the prevailing party." *Bogan v. City of Chicago*, 644 F.3d 563, 572 (7th Cir. 2011). To put the claimants' burden colloquially, "[a]ttacking a jury verdict is a hard row to hoe." *Walker*, 410 F.3d at 394 (quoting *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1043 (7th Cir. 1999)).

The government based its case for forfeiture on 21 U.S.C. § 881(a)(6), which makes subject to forfeiture "[a]ll moneys … furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an ex-

change, and all moneys … used or intended to be used to facilitate any violation of this subchapter." As discussed above, the instructions at trial required the government to prove "by a preponderance of the evidence" that the money fit into one of those categories and that "there was a substantial connection between the [money] and the offense." *See* 18 U.S.C. §§ 983(c)(1), (3).

Having reviewed the record, we conclude it was not irrational for the jury to find the $100,120 was subject to forfeiture. First, the evidence at trial showed Fallon had purchased a one-way ticket, with cash, just two days before his trip. He had reserved a private room. And he was traveling to a city known as a source for drugs. All of this conduct fit the contours of a drug-courier profile. Certainly, such profiles are subject to legitimate criticism. *See, e.g.*, *United States v. Sokolow*, 490 U.S. 1, 13 (1989) (Marshall, J., dissenting) (referring to a "profile's 'chameleon-like way of adapting to any particular set of observations'" (quoting *United States v. Sokolow*, 831 F.2d 1413, 1418 (9th Cir. 1987))). But the jury was entitled to credit it as some evidence that the currency was connected with drug trafficking.

There is also evidence of the drug dog's alert. The claimants sought to undermine the dog sniff on a number of grounds, including suggesting that all currency is tainted with trace amounts of illegal drugs. But the jury heard evidence that this dog had a perfect record: 116 out of 116, including not alerting to untainted currency. It was entirely rational for the jury to reject the claimants' suggestions and accept the dog sniff as evidence the currency had been in contact with drugs.

Finally, adding to the drug-courier profile and the drug dog's alert are the inconsistent and implausible explanations the claimants gave for why Fallon found himself on the train that December day. When he was first stopped on the train, Fallon said he was going to Seattle to visit "a lady friend" and he was not carrying large amounts of currency. As the encounter with law enforcement unfolded, he said he was carrying $50,000 to "maybe put a down payment on a house." The claimants point to no evidence Fallon ever told law enforcement about a safety-deposit box or investing in a restaurant on the West Coast.

Then, Marrocco testified the money actually represented his savings, though the government presented evidence suggesting Marrocco could not have legitimately saved that much money. Marrocco said he had entrusted the money to Fallon to take it to the West Coast to place it in a safety-deposit box so that it could be used to invest in an unidentified restaurant or bar. To top it all off, Marrocco claimed that he, a then thirty-two year old who was supposedly sophisticated enough to invest in a restaurant or bar approximately 2,000 miles away, was unable to open a bank account due to credit problems from his college days. The jury was certainly allowed to disbelieve that testimony and consider it evidence of the money's connection to something unlawful. *See N.L.R.B. v. Walton Mfg. Co.*, 369 U.S. 404, 408 (1962) ("For the demeanor of a witness 'may satisfy the tribunal, not only that the witness'[s] testimony is not true, but that the truth is the opposite of his story … .'" (quoting *Dyer v. MacDougall*, 201 F.2d 265, 269 (2d Cir. 1952) (Hand, J.))); *cf. United States v. Burgos*, 94 F.3d 849, 867 (4th Cir. 1996) ("Relating implausible, conflicting tales to the jury can be rationally viewed as further circumstantial evidence indicating guilt."). Considering these

implausible and conflicting explanations coupled with Fallon's suspicious conduct and the drug dog's alert, it was not irrational for the jury to find, by the low standard of a preponderance, that the currency was substantially connected with an unlawful drug transaction and fit within one of § 881(a)(6)'s categories.[7]

### C. Excessive Fine

We come to the final point of contention: the proportionality of the forfeiture. The Eighth Amendment prohibits excessive fines. *See* U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed … ."). Civil forfeitures can violate that prohibition. *See Austin v. United States*, 509 U.S. 602, 604 (1993). The forfeiture statute acknowledges that fact and provides a procedure for a claimant to challenge a forfeiture as "constitutionally excessive." *See* 18 U.S.C. §

---

[7] In arguing these facts are insufficient to justify forfeiture, the claimants cite *$271,080*, 816 F.3d at 905 (reversing grant of summary judgment to the government despite drugs being found inside the house and a drug dog alerting to a safe containing cash), and *United States v. $506,231*, 125 F.3d 442, 444, 451–54 (7th Cir. 1997) (commenting in the alternative that summary judgment was inappropriate where the money was "found inside a forty-four gallon barrel which was located inside a boarded-up elevator or dumbwaiter shaft" at a pizzeria and a drug dog alerted to some of the currency). But those cases suffered from weaknesses not present in this case, *see $271,080*, 816 F.3d at 909 (no evidence of the drug dog's training); *$506,231*, 125 F.3d at 452 (no indication the government's evidence suggested the claimants could not have earned the money legitimately). And they were addressing the sufficiency of evidence on summary judgment, not after a jury verdict. We agree the evidence here is not sufficient to rule out questions of fact and support summary judgment. *See $100,120*, 730 F.3d at 727. But that does not mean a jury could not find it sufficient at trial.

983(g). Under the statute, a claimant must show, by a preponderance of the evidence, that the forfeiture is "grossly disproportional" to "the gravity of the offense giving rise to the forfeiture." *Id.* at (g)(2), (3). The statute further provides that a claimant will have the opportunity to make his case "at a hearing conducted by the court without a jury." *Id.* at (g)(3).

The claimants make two arguments concerning the alleged excessiveness of the forfeiture here. They contend the government's failure to show that either claimant participated in any drug transaction makes the forfeiture of any of the $100,120 excessive. They also argue the district court improperly declined to provide them with a hearing on the proportionality of the forfeiture. The district court disagreed, and so do we.

First, this is not a case where the money was legitimate but the forfeiture was ordered as the result of some reporting offense. *See generally United States v. Bajakajian*, 524 U.S. 321, 325 (1998) (concluding that forfeiture of $357,144 for the defendant's failure to declare he was transporting it "would be grossly disproportional to the gravity of his offense"). Instead, a jury concluded the currency was substantially connected with an unlawful drug transaction. The general rule is that property so connected to a crime is forfeitable. *See United States v. Betancourt*, 422 F.3d 240, 250 (5th Cir. 2005) ("All proceeds obtained from unlawful conduct and property traceable to those proceeds are subject to criminal forfeiture."). As a matter of law, then, the forfeiture of all the money at issue here, where a jury determined the money was substantially connected with an unlawful drug transaction, was not excessive.

Second, because the whole *res* is subject to forfeiture as a matter of law, there was no need to hold a hearing. There was no fact question not already resolved by the jury, nothing for the claimants to prove by a preponderance of the evidence. As the district court put it, all the claimants would be doing is arguing that forfeiture of funds so intimately connected with drug trafficking in order to have acquired the smell of the drugs themselves is disproportionate to drug trafficking. What the claimants want to do is reargue the grounds for forfeiture, but that is not the point of a hearing on excessiveness. Just as summary judgment does not deprive a civil defendant of his constitutional right to a jury trial, *see BMG Music v. Gonzalez*, 430 F.3d 888, 892 (7th Cir. 2005), neither did not holding a hearing under these circumstances deprive the claimants of the statute's protections.[8]

**III.**

Civil forfeiture is a much maligned practice, *see, e.g.*, *United States v. $506,231*, 125 F.3d 442, 454 (7th Cir. 1997) ("We are certainly not the first court to be 'enormously troubled by the government's increasing and virtually unchecked use of the civil forfeiture statutes and the disregard for … due process that is buried in those statutes.'" (quoting *United States v. All Assets of Statewide Auto Parts, Inc.*, 971 F.2d 896, 905 (2d Cir. 1992))), and this case certainly has characteristics suggesting why. The claimants, who lose $100,120, have not been charged with, let alone convicted of, any crime relating to that

---

[8] As they did in their appeal of the grant of summary judgment, the claimants also raise the issue of the suppression of the funds as the fruit of a Fourth Amendment violation, which was the subject of their first appeal. "[W]e decline to reconsider our earlier decision." *$100,120*, 730 F.3d at 727.

$100,120. The government, who gets to keep the $100,120 for itself, seized the drug-contaminated currency on a Friday and deposited it the following Monday without chemically testing, or even saving, a single bill. And both sides have now been engaged in a legal battle that has stretched over fifteen years.

But it is not our role to decide whether the government should be pursuing these kinds of cases. Our responsibility is solely to decide whether the law as it stands was followed. We conclude it was. The judgment is AFFIRMED.