**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 20-2251**

---

UNITED STATES OF AMERICA,

> Plaintiff – Appellee,

v.

DERECK MCCLELLAN; YVONNE SILVER,

> Claimants – Appellants,

and

69,940.50 IN UNITED STATES CURRENCY, Asset ID: 19–CBP–000267,

> Defendant.

------------------------------

INSTITUTE FOR JUSTICE,

> Amicus Supporting Appellants.

---

Appeal from the United States District Court for the District of South Carolina, at Greenville.  Henry M. Herlong, Jr., Senior District Judge.  (6:19-cv-01976-HMH)

---

Argued:  May 4, 2022                    Decided:  August 10, 2022

---

Before WILKINSON, RICHARDSON, and RUSHING, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Richardson wrote the opinion, in which Judge Rushing joined. Judge Wilkinson wrote a separate opinion, dissenting.

––––––––––––––

**ARGUED:** Adrianne Turner, TURNER LAW, LLC, Columbia, South Carolina, for Appellants. Carrie Fisher Sherard, OFFICE OF THE UNITED STATES ATTORNEY, Greenville, South Carolina, for Appellee. Robert Everett Johnson, INSTITUTE FOR JUSTICE, Shaker Heights, Ohio, for Amicus Curiae. **ON BRIEF:** M. Rhett DeHart, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee. Caroline Grace Brothers, INSTITUTE FOR JUSTICE, Arlington, Virginia, for Amicus Curiae.

––––––––––––––

RICHARDSON, Circuit Judge:

The United States Government seized $69,940.50 in cash from Dereck McClellan's car. McClellan and his girlfriend, Yvonne Silver, challenged the seizure, claiming that the cash was not subject to forfeiture. To forfeit the seized cash, the Government bore the burden of establishing a connection between the cash and the illegal activity—in this case, illegal drug trafficking. The district court, in granting summary judgment, found that the facts painted a picture that definitively established that the cash was drug money. And it's true that a reasonable jury might well decide that the painting of these facts shows the cash came from drug trafficking. But a reasonable jury might not. So we reverse.

## I.      Background

In early January 2019, Dereck McClellan smashed his car into a concrete pillar at a gas station, narrowly missing a gas pump. A local officer responded to the scene. Approaching the car, the officer noticed the strong odor of marijuana. The driver's window was down, and the officer found McClellan passed out in the front seat next to an empty Hennessey bottle. The officer woke McClellan, who staggered out of the vehicle. Given McClellan's condition, the officer arrested him for public drunkenness and driving with an open container (otherwise known as "transportation of alcohol in a motor vehicle with a broken seal"). McClellan also admitted that he had "smoked some marijuana." J.A. 9.

A search of the vehicle revealed a marijuana blunt in the ash tray, a bundle of cash in the console, and a duffel bag filled with cash in the trunk. There were also two medical marijuana identification cards in McClellan's wallet. The seized cash was separated into bundles secured with rubber bands and totaled $69,940.50. When asked about his

3

occupation, McClellan said he "does a lot of different stuff," J.A. 9, and when asked about where he got the cash, McClellan said it was for his girlfriend's shop. McClellan refused to provide his girlfriend's name or the name or location of the store. McClellan also offered various totals for how much cash he had in the car, suggesting at separate times that the car had $80,000, $70,000, and between $72,000 to $73,000 in it. Later, the Department of Homeland Security conducted five ion scans on the currency. Ion scans detect minute particles on an object and determine the substance of those particles. All five ion scans tested positive for cocaine, and one scan tested positive for the explosive substance RDX.

One of the medical marijuana cards in McClellan's wallet identified McClellan as its owner, and the other belonged to "Yvonna Silver." J.A. 78–79.[1] The cards were two years old, with McClellan and Silver both using the same California address. The address was for a hotel. Police later discovered that Silver was McClellan's girlfriend and that the two lived together with their three children. Police also later discovered that Silver's shop, which McClellan had identified as the source of the cash, was called Labelz StyleHouse. Labelz sells consumer goods, some of which were allegedly counterfeit. But Labelz is not an incorporated entity, so for practical purposes it is indistinguishable from Silver herself.

Before McClellan's crash into the gas station, he already had a long criminal record. In 2002, he was convicted of unlawfully carrying a weapon. In 2007, he was convicted of trafficking cocaine and meth. In 2008, he was convicted of assault and battery and receipt of stolen goods. In 2013, he was convicted of possession of marijuana with intent to

---

[1] Although Silver appears here as "Yvonne Silver," she also uses "Yvonna Silver."

4

distribute. In connection with the 2013 conviction, law enforcement seized and forfeited $53,495. Since 2013, McClellan has not been convicted of any other crimes.

Following McClellan's crash, the Department of Homeland Security sought to forfeit the seized cash found in the car. McClellan and Silver (together the "Claimants") both filed seized-asset claims contesting the administrative forfeiture and made sworn statements that they owned the seized currency "together equally" and that it consisted "entirely of profits from [their] retail business, Labelz StyleHouse." J.A. 2; S.J.A. 2–3, 6. They also requested referral to the district court. The Government then filed a verified civil complaint for forfeiture in the district court and applied for a warrant for arrest in rem of the seized cash. The complaint alleged that the cash was subject to forfeiture because it constituted drug proceeds, among other reasons. The court issued an arrest warrant for the currency, and McClellan and Silver answered the complaint.

In response to civil interrogatories, McClellan and Silver explained where the money came from. McClellan described how his mother died in 2014 and left him $110,000 and her home. He said living in the mortgage-free home, along with Silver and their three children, allowed them to keep their expenses low. He also claimed that he invested some of his inheritance money as "seed money" to help Silver start Lablez Stylehouse. J.A. 19. And from that investment McClellan claimed that he and Silver shared "profits" of $40,000, $60,000, and $90,000 over the past three years. J.A. 19. Silver also claimed that she earned about $2,500 per week as the manager of Ultra Lounge Bar from 2014 to 2017.

Silver's tax returns tell a different story. Her tax returns show no income from Ultra Lounge Bar. And the returns claimed that her store had much lower net profits—a total of $62,894 over the four tax years from 2016 to 2019.[2] For the years 2016 to 2019, other than earnings from Labelz, Silver reported no other income on her tax return, although she received refundable tax credits from the federal government for these years that totaled several thousand dollars.

The Government moved for summary judgment against the Claimants, which the district court granted. According to the district court, there was no genuine dispute of material fact that the seized cash was the proceeds of a drug trafficking operation.

## II.    Discussion

In a civil-forfeiture proceeding, the Government bears the burden "to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1).[3] Property is subject to forfeiture if it either facilitated the transportation, sale,

---

[2] Net profit is a business's total income, less all expenses. In 2016, 2017, and 2018, Silver reported $10,099, $15,702, and $19,146, respectively, in net profits from Labelz, for a grand total of $44,947 for those three years. Unlike net profits, gross receipts are all income earned by the business without accounting for expenses. Her reported gross receipts for those same years were: $20,789, $41,992, and $62,956. Though the cash here was seized in January 2019, she later reported a 2019 net profit of $17,947 from gross receipts of $55,858.

[3] The Civil Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, 114 Stat. 202, 205, placed the burden on the Government to prove that the property is subject to forfeiture. Before that Act, the Government only had to establish probable cause that the property was subject to forfeiture, and then the burden shifted to the property owner to prove a legitimate source of the funds by preponderance of the evidence. *See United States v. One Parcel of Real Est. Located at 7715 Betsey Bruce Lane*, 906 F.2d 110, 111 (4th Cir. 1990).

receipt, possession, or concealment of a controlled substance, or was intended to do so, or constitutes proceeds of drug-trafficking activities.  21 U.S.C. § 881(a)(6).[4]  And when pursuing forfeiture on either of those theories, the Government must show a "substantial connection between the property and the offense."  18 U.S.C. § 983(c)(3).

Applying the summary judgment standard in a civil forfeiture action is no different than in any other civil case.  We review the district court's grant of summary judgment de novo and "constru[e] all facts and reasonable inferences therefrom in favor of the nonmoving party."  *Gen. Ins. Co. of Am. v. U.S. Fire Ins.*, 886 F.3d 346, 353 (4th Cir. 2018).  We grant summary judgment only when "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "[T]he judge must view the evidence presented through the prism of the substantive evidentiary burden," and must deny summary judgment if "a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).  Even when the facts themselves are not in dispute, a genuine dispute of material fact about the inferences to be drawn from those facts precludes summary judgment.  *World-Wide Rts. Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).  We begin with the Government's evidence, considering it

---

[4] "The following shall be subject to forfeiture to the United States and no property right shall exist in them . . . (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter."  § 881(a)(6).

7

as a whole but taking care to construe all facts and inferences in the light most favorable to the Claimants.

We start with a piece of evidence that contributes nothing to the whole. The Government argues that McClellan's *prior* drug charges and the cash forfeited in 2013 are evidence that he was likely dealing drugs when the cash was seized. In doing so, the Government asks us to make exactly the kind of "forbidden propensity inference" that the Federal Rules of Evidence prohibit. *See United States v. Hall*, 858 F.3d 254, 266 (4th Cir. 2017) (quoting *United States v. Davis*, 726 F.3d 434, 442 (3d Cir. 2013)). The Federal Rules of Evidence bar parties from introducing evidence of a crime "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The rule ensures that the accused is tried for the allegation at hand and not his past wrongs. *See Hall*, 858 F.3d at 266. Thus, "it is well established that the 'fact that a defendant may have been involved in drug activity in the past does not in and of itself provide sufficient nexus to the charged conduct where the prior activity is not related in time, manner, place, or pattern of conduct.'" *Id.* at 261 (quoting *United States v. Johnson*, 617 F.3d 286, 297 (4th Cir. 2010)).

Evidence of a prior crime may be admissible for purposes other than propensity,[5] but it is the Government's burden to prove that evidence of a prior crime is admissible for a proper purpose. *Id.* at 266. To meet that burden, the Government "must identify each

---

[5] Evidence of a prior bad act may be admissible for purposes other than propensity "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

proper purpose for which it will use the other acts evidence and explain how that evidence fits into a chain of inferences—a chain that connects the evidence to each proper purpose, no link of which is a forbidden propensity inference." *Id.* (cleaned up). Here, the Government has not attempted to offer a "proper purpose" for considering this evidence at this stage.[6] Because "evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment," *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991), we cannot rely on McClellan's past convictions.[7]

As for the rest of the evidence, the Government first tries to connect the cash to drug transactions based on the five ion scans that tested positive for cocaine. Ion scans detect particles and determine their substance. Because ion scans can detect mere particles, extremely small amounts of a substance may well trigger a "positive" result. So a positive scan may only show that the cash has a trace amount of cocaine on it. Standing alone then, the positive scan tells us little about when, where, or why the cash contacted cocaine. And the Government put forward no evidence to provide context for interpreting the positive

---

[6] At oral argument, the Government suggested that the prior convictions were relevant to motive or to knowledge of how to transport drug money. But we will not rely on these late-raised theories in reviewing the grant of summary judgment.

[7] The district court based its consideration of McClellan's prior convictions, in part, on the Sixth Circuit's decision in *United States v. $62,220.00 in United States Currency*, 957 F.2d 280, 286 (1992), which was decided under the earlier standard that only required the Government to establish probable cause and then placed the burden at summary judgment on the claimant. And prior bad acts can be relevant to finding probable cause. *See id.* But the law now squarely places the burden of persuasion on the Government and therefore requires evidence in a "form that would be admissible." *See* Fed. R. Civ. P. 56(c)(2); *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 509 (5th Cir. 2008) ("Evidence not admissible under the Federal Rules of Evidence is not permitted in deciding the merits of a forfeiture case." (cleaned up)).

9

scan of this cash. At least some information suggests "widespread" cocaine contamination in our money supply. *Jones v. DEA*, 819 F. Supp. 698, 720 (M.D. Tenn. 1993) (noting studies estimating that between one-third and 97% of cash is contaminated with cocaine). So as it stands, we cannot reasonably infer that the positive ion test suggests this cash was uniquely connected to drugs.

Perhaps the Government has information that would explain how these scans tell us something more. Maybe it can distinguish the positive scan here from the trace amounts that may appear on ordinary bills. But, at this stage, using the positive ion scan alone to connect this cash to drug trafficking is speculative at best. *See, e.g.*, *United States v. Ten Thousand Seven Hundred Dollars & No Cents ($10,700.00) in U.S. Currency*, 258 F.3d 215, 231 (3d Cir. 2001) (noting the failure of the Government to produce evidence why ion test results were "scientifically significant . . . when compared to 'the norm'").[8]

This conclusion is bolstered by the Government's treatment of the RDX revealed on the scans. As noted, the ion scans of this cash also revealed RDX, which is an explosive. But the Government does not rely on the presence of explosive particles to suggest that McClellan trafficked in explosives—an activity that we would expect to get the

---

[8] This problem may not be shared by another means of cocaine detection, drug-sniffing dogs. Some research suggests that unlike ion scanners, which detect the presence of cocaine itself, drug-sniffing dogs detect the presence of methyl benzoate, a volatile byproduct of cocaine present only if the cash has *recently* been tainted with cocaine. *See United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars ($30,670.00)*, 403 F.3d 448, 462 (7th Cir. 2005) ("[T]he very ephemeral nature of the methyl benzoate byproduct of illicit cocaine makes it highly likely that [the] cash hoard was in very close proximity to large amounts of the drug within hours or days of [the dog] alerting to it."). Not that drug-sniffing dogs are themselves infallible. But they may not face the same concerns as ion scans.

Government's attention and may also permit forfeiture. *See* 18 U.S.C. §§ 981, 842. One inference might be that cash may indeed carry residual contamination—whether explosives or cocaine—that is detected by ion scans. So given our obligation to construe inferences in favor of the Claimants, the ion scans cannot connect this cash with drug trafficking.[9]

Next, the Government turns from cocaine to marijuana, arguing that the Claimants' medical marijuana cards should create an inference that they engaged in marijuana trafficking. This inference arises, they contend, because marijuana dealers often use medical marijuana cards to buy marijuana in states where it is legal and then bring it to other states for illegal sale.[10] But California legalized even recreational marijuana before they obtained the cards in 2017. And even if the cards are sometimes used by drug dealers as the Government describes, the cards can also be used to buy marijuana for personal use. Other than these cards, the Government has presented no evidence of marijuana trafficking.

---

[9] It is worth emphasizing the different burdens of proof and standards of review in civil-asset-forfeiture cases versus probable-cause determinations (another circumstance in which we regularly consider the significance of the presence of drugs on money). While the Government's burden here is a preponderance of the evidence, "[p]robable cause has long been understood to encompass circumstances that, while *less than a preponderance*, 'warrant suspicion.'" *United States v. Gondres-Medrano*, 3 F.4th 708, 713 (4th Cir. 2021) (emphasis added) (quoting *Locke v. United States*, 11 U.S. (7 Cranch) 339, 348 (1813)). And when reviewing a judicial finding of probable cause, we view the evidence in the light most favorable to the Government and draw inferences in its favor. *United States v. McBride*, 676 F.3d 385, 391 (4th Cir. 2012). But on summary judgment we must do the opposite and affirm only if no reasonable juror could come out the other way.

[10] The Government argues that the Claimants obtained the medical marijuana cards through fraud because a California address is listed on the cards, and Claimants swore during discovery that they had lived in South Carolina the past five years. But the Government put forward no evidence that the cards required California residency. So we cannot infer that Claimants acted dishonestly. And even if we could, connecting that potential dishonesty to trafficking marijuana requires yet another inferential leap.

11

Indeed, the marijuana blunt found in the car tends to suggest the personal use of marijuana that McClellan admitted to.

The personal use of marijuana also does not establish a link to a broader drug-trafficking scheme that might involve the tens of thousands of dollars seized here. Users of marijuana do not necessarily traffic in marijuana or cocaine. *See Turner v. United States*, 396 U.S. 398, 423 (1970) ("[B]are possession of cocaine is an insufficient predicate for concluding that Turner was dispensing or distributing."). The cash here is only subject to forfeiture if it was exchanged for drugs, traceable to drug dealings, or intended to be used to violate federal drug laws. *See* 21 U.S.C. § 881(a)(6). And the ion scans tested positive for cocaine, not marijuana. A reasonable juror could look at all this evidence and come away unconvinced that the Claimants were marijuana dealers.

The Government makes one final argument: The Claimants have not adequately explained the source of the cash. Claimants explained that the cash came from their retail business, Labelz StyleHouse. In doing so, they claimed to have made $190,000 in profits over the last three years. But the information they provided to the IRS on tax returns suggests Labelz only made $62,893 in net profits from 2016 to 2019 (an amount less than the $69,940.50 in seized cash). The discrepancy between the amount seized and Labelz's net profits, the Government argues, shows that the Claimants' explanation for the seized cash is false. And thus the cash must be drug proceeds.

We disagree. The Government's premise that the Claimants' explanation contradicts their tax records is not airtight (and that is what matters at summary judgment). The Claimants also have an explanation for how the cash was generated, even if it was not

12

strictly net profits. And even if a juror might infer that either the tax return or the claim of Labelz's profits is false, that inference would not establish which one is false. Finally, even if the Claimants' description of the cash as Labelz's profits was false, a juror would not have to infer from that false explanation that the cash was drug proceeds.

First, the Claimants' explanation need not be understood as inconsistent with their tax records. According to the Government, when the Claimants say the money in the car is "profits," they can only mean net profit—which would be impossible because for the three years before the seizure, Labelz's net profits (as reported on Silver's tax returns) only total $44,947. But, according to Claimants, when they at first swore that the seized cash was Labelz's "profits," they did not mean profits in the technical sense but merely meant to refer to Labelz's funds—i.e., its "working capital." Reply Br. 3. Those funds, according to Claimants, included a portion of McClellan's $110,000 inheritance—which he used as "seed money" for the Labelz business—and other operating cash generated by the business. J.A. 19.

The Government says we must reject this explanation because the Claimants swore that the cash came only from "profits." It is true that "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Jessup v. Barnes Grp.*, 23 F.4th 360, 367 (4th Cir. 2022) (cleaned up). But when a plaintiff "does not contradict his prior statements but instead merely [adds] details and lends context to them, we do not disregard" those statements. *See id.* (cleaned up). The Claimants' sworn statements, as explained in arguments to this Court, could reasonably be construed to be of the latter variety, a

13

clarification, supported by the record, that they meant to convey that the seized cash was part of Labelz's funds. Under our precedent, we are not bound to take the Claimants as technically as the Government would have us, and any credibility determinations based on the Claimants' revision to their original story are for the jury to make. *See id.*

The Government also argues that the Claimants' explanation is implausible because they were too poor to save that much of their profits given that Labelz was the Claimants' sole source of income between 2016 and 2019. However, that ignores McClellan's inheritance of the $110,000 and a mortgage-free home. McClellan also claims that he received $25,000 from a car wreck settlement in 2014. Silver's responses also identify various sources of income other than Labelz, including an insurance payout, the sale of two cars, income from work at the Ultra Lounge Bar, and refundable tax credits. McClellan and Silver claim non-Labelz income from 2014 to January 2019 totaling more than $150,000. Considering that they own their home and have no mortgage payment, it is for the jury to decide whether they believe that Claimants socked away their Labelz profits while living on other sources of income.

But even if we were to find the Claimants' explanation for the cash inconsistent with their tax returns, that would only tell us that either the explanation or the tax returns are false—but not which one. Indeed, there is some reason to be skeptical about the veracity of Silver's tax returns. Silver claims to have been a manager at Ultra Lounge Bar, bringing in $500 per day in salary and tips, between 2014 and 2017. Yet her 2016 tax return reports no income from salaries or tips at all (and the relevant portion of the 2017 return is missing). The portion of the return concerning Labelz also looks fishy: Claimants assert that Labelz

14

is a "buy and sell commercial retail operation[]," which buys clothing and then resells it. Reply Br. 3. But on Silver's return, the "cost of goods sold"—which is where one would expect to see how much Labelz paid for its inventory—is left completely blank every year. In short, the evidence might well raise questions about Silver's tax returns. But tax fraud does not a drug dealer make.[11]

Finally, even if the Government proved the Claimants' story false, that alone would not entitle the Government to summary judgment. Disproving that the cash was Labelz's funds does not prove that the cash is drug proceeds. When a defendant makes a false exculpatory statement, that statement is evidence of the defendant's consciousness of guilt. *United States v. McDougald*, 650 F.2d 532, 533 (4th Cir. 1981) (per curiam) (citing *Wilson v. United States*, 162 U.S. 613, 620–21 (1896)). But it is the jury's role to determine what inferences to draw from someone's false exculpatory statements. *See, e.g.*, *Wilson*, 162

---

[11] In its complaint below, the Government argued that the money could be traced to proceeds of drug trafficking as well as property involved in violations of 18 U.S.C. §§ 1956(a)(1)(A), 1956(a)(1)(B)(1), 1956(c)(7), 1956(h), 1957, 1960, and 2320. All in all, that covers a huge number of crimes. The complaint therefore indirectly references tax evasion, counterfeiting, and even the use of explosives in interstate commerce. *See* 18 U.S.C. § 1956(a)(1)(A)(ii) (referencing tax evasion under 26 U.S.C. § 7201); § 1956(c)(7)(D) (referencing the use of explosives in interstate commerce under 18 U.S.C. § 844(f)); § 2320 (referencing counterfeiting). But, for the same reason, the complaint also indirectly references crimes relating to Presidential assassination, maritime navigation, overseas terrorist acts by American nationals, credit fraud, smuggling through border tunnels, and murder, among many, many others. *See* § 1956(a)(1), (c)(7). In front of this court, the Government focused exclusively on a drug-trafficking theory. There is one paragraph in the Government's brief arguing that forfeiture may be based on multiple theories, but it does not make any arguments based on those theories, let alone about tax evasion. *See* Appellee's Br. 36–37. Beyond the shotgun complaint, the Government has not relied on a theory of forfeiture based on tax evasion, explosives, or assassination, so we take no position on those theories here and focus only on drug trafficking.

U.S. at 621 ("The destruction, suppression, or fabrication of evidence undoubtably gives rise to a presumption of guilt, *to be dealt with by the jury*." (emphasis added)); *United States v. Holbert*, 578 F.2d 128, 130 (5th Cir. 1978) ("[T]he significance to be attached to any such evidence is exclusively within the province of the jury."). A jury, faced with evidence that the seized currency was not from Labelz, could conclude that the currency is drug proceeds, but they would not be required to. A reasonable juror could find that the Claimants lied about the source of the cash for some other reason—perhaps to avoid embarrassment or to conceal other illicit activity that would not give rise to forfeiture—so a genuine dispute of material fact persists even in the face of a false exculpatory statement.

The Government's argument that the Claimants fail to adequately explain a legal source of the cash resembles *res ipsa loquitur* in tort claims, and courts have roundly denied like arguments by plaintiffs in that context. The *res ipsa loquitor* tort doctrine "*permits*, but ordinarily does not *compel*, a fact finder to infer negligence from the mere occurrence of a bad outcome." *Campbell v. Florian*, 972 F.3d 385, 396 (4th Cir. 2020). It requires circumstances when a "bad outcome does not ordinarily occur without some negligent act of omission," *id.*, and a "defendant must have exclusive control of all the things . . . which might probably have caused injury," *Jesionowski v. Bos. & M.R.R.*, 329 U.S. 452, 456 (1947). Here, the Government's argument takes the same shape. The Government argues that lawful citizens do not carry around large amounts of cash that are rubber-banded and bundled, so the Claimants must explain the source of the cash, or the Government is entitled to summary judgment.

16

Yet courts applying the *res ipsa loquitur* doctrine regularly reject arguments like that when the plaintiff moves for summary judgment. When *res ipsa loquitur* applies jurors "are not bound to presume negligence from the absence of an explanation, but, given all the surrounding circumstances, they may or may not infer it." *Salomone v. Yellow Taxi Corp.*, 151 N.E. 442, 445 (N.Y. 1926); *see Greyhound Corp. v. Ford*, 157 So. 2d 427, 431 (Fla. Dist. Ct. App. 1963) ("The doctrine will support a jury verdict but not a directed verdict . . . ."). Summary judgment for the plaintiff on a *res ipsa loquitur* theory is appropriate only "where the prima facie proof is so convincing that the inference of negligence arising therefrom is inescapable." *Gerard v. Inglese*, 11 A.D.2d 381, 383 (N.Y. App. Div. 1960); *accord Est. of LeMay ex rel. LeMay v. Eli Lily & Co.*, 960 F. Supp. 183, 185 (E.D. Wis. 1997). It is not as if the inference that the cash constituted drug proceeds is inescapable. While it may be dubious to drive around with a large amount of cash in one's car, it does not create an inescapable inference of criminal activity. Not using a bank does not necessarily make one a criminal. Even if a jury rejects the Claimants' assertion that the cash was Labelz's funds, and even if Claimants have no other explanation, the jury could still conclude that, given the dearth of direct evidence of drug dealing, the cash does not constitute drug proceeds. *See Salomone*, 151 N.E. at 445.

Although we have discussed the inferences that the jury could appropriately draw from each piece of evidence one-by-one, considering the evidence in its totality does not change the result here. *See Whiteman v. Chesapeake Appalachia, L.L.C.*, 729 F.3d 381, 385 (4th Cir. 2013). In doing so, we do not "divide and conquer" the facts, *see Lund v. Rowan Cnty.*, 863 F.3d 268, 289 (4th Cir. 2017) (en banc) (quoting *United States v. Arvizu*,

17

534 U.S. 266, 274 (2002)), but recognize the Government's evidence for what it is—insufficient to mandate the conclusion that the seized cash is drug proceeds.

To recap, the permissible evidence consists of the positive ion scans for cocaine on the cash, the Claimants' medical marijuana cards obtained from California, the presence of a single marijuana blunt in McClellan's car, and the possible inconsistency of the amount of cash with Claimants' tax returns. The Government claims this shows, beyond what any rational juror could dispute, that Claimants obtained that cash from drug trafficking. But there are other plausible inferences. For instance, Claimants could have lived frugally while saving Labelz profits, personally used marijuana and used the California card for personal use while in California, and had cash that was incidentally contaminated with cocaine like much—perhaps most—cash is. Or the jury could conclude that some other combination of the host of innocent explanations that we have discussed above apply here. But whatever the story, a rational juror would not be *compelled* to find they were drug dealers.

The Government has the burden of proof here, and that makes all the difference. The Government lacks any direct evidence of a drug transaction or involvement in the drug trade beyond McClellan's possession of a single marijuana blunt and medical marijuana cards. The Government would have us rely on its own inferences from its circumstantial evidence, which we may not do. *General Ins. Co. of Am.*, 886 F.3d at 353. And, as we

18

have described, jurors could discredit much of the Government's evidence. Although the whole may be more than the sum of the parts, here the whole is not enough.[12]

*      *      *

Summary judgment in a forfeiture proceeding is like summary judgment in any other civil case. Applying those standards correctly ensures that the Government must prove its case before depriving citizens of their private property based on an allegation of wrongdoing. Here, the Government convinced the district court that the facts paint a picture that definitively establishes that the cash was drug money. But as we see it, the record is not quite so clear. The painting is more Pollock than Monet. As a reasonable jury could interpret it more than one way, the district court's judgment is

*REVERSED AND REMANDED.*

---

[12] The Claimants' brief also devotes three sentences to the claim that forfeiture of the seized currency would violate the Claimants' right to be free from excessive fines under the Eighth Amendment. But the Claimants' short argument provides no legal reasoning or citations explaining why this forfeiture would violate the Excessive Fines Clause, and we therefore find that argument waived. *See Li v. Gonzeles*, 405 F.3d 171, 175 n.4 (4th Cir. 2005).

WILKINSON, Circuit Judge, dissenting:

It is often said that hard cases make bad law. This is the rarer occasion where a straightforward case makes bad law. The government here presented ample evidence that McClellan was transporting drug money and that the cash in his car was subject to forfeiture. And the explanation that McClellan ultimately gave for the cash was both fanciful and flatly contradicted by the evidence. The majority's approach is to divide and conquer that evidence, a technique that has been rejected by courts beyond number. For these reasons, the district court properly granted summary judgment, and I respectfully dissent from the majority opinion concluding otherwise.

I.

In order to prevail at summary judgment, the government had to show under facts not genuinely in dispute and by a preponderance of the evidence that McClellan's currency was subject to forfeiture. *See* 18 U.S.C. § 983(c)(1). In particular, if all reasonable jurors would conclude that it was more likely than not that the cash constituted proceeds of drug trafficking, summary judgment was appropriate. *See* 21 U.S.C. § 881(a)(6) (providing that assets "furnished or intended to be furnished by any person in exchange for a controlled substance" or "proceeds traceable to such an exchange" are forfeitable). The government plainly met that burden.

Just consider the facts, which together prove the soundness of the trial court's practical judgment. Early on a Sunday morning, local police found Dereck McClellan passed out in the driver's seat of a vehicle that had crashed into a concrete pillar at a gas

20

station. The vehicle smelled strongly of marijuana and a search revealed a marijuana blunt in the ash tray, as well as an open bottle of liquor and medical marijuana cards that McClellan and his girlfriend, Yvonne Silver, apparently had secured in California. That search also revealed approximately $70,000 in cash, bundled with rubber bands and placed in a Nike duffel bag in the trunk. Ion scans of the cash consistently tested positive for the presence of cocaine. And in addition to all of this, McClellan had multiple previous convictions for drug trafficking offenses, most recently in 2013 for possession with intent to distribute marijuana, an arrest that coincided with the seizure of approximately $53,000 in drug proceeds.

When asked about the cash, McClellan was initially evasive: he did not state a specific occupation nor did he give a consistent account of the amount of money in the bag. McClellan stated that the cash was for his girlfriend's shop, but at first he refused to identify either his girlfriend or the name of the business. Ultimately, McClellan said that the business was a boutique shop called Labelz Stylehouse, owned by Silver, and both he and Silver stated in sworn statements that the cash consisted "entirely of profits" from that business. S.J.A. 2–3. But tax records showed that over the previous four years, Labelz had generated only $63,000 in net profits and, further, that these profits constituted the only source of reported income for both McClellan and Silver.

In short, this case reads like a laundry list of the factors that courts use to determine that assets are tied to drug trafficking. Start with the basic circumstances of the arrest. As courts have noted, "[a] common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles." *United States v.*

21

*$242,484.00*, 389 F.3d 1149, 1161 (11th Cir. 2004) (en banc). By contrast, "drug rings . . . commonly do utilize couriers to transport in cash their ill gotten gains, which can be huge." *Id.* So "[a] large amount of currency, while not alone sufficient to establish a connection to a drug transaction, is 'strong evidence' of such a connection." *United States v. $252,300.00 in U.S. Currency*, 484 F.3d 1271, 1275 (10th Cir. 2007) (quoting *United States v. $149,442.43 in U.S. Currency*, 965 F.2d 868, 877 (10th Cir. 1992)).

Finally, and in addition to all this, "[a] claimant's record of drug activity," such as McClellan's previous convictions for trafficking cocaine and possessing marijuana with intent to distribute, "is a highly probative factor in the forfeiture calculus." *United States v. $67,220.00 in U.S. Currency*, 957 F.2d 280, 286 (6th Cir. 1992). McClellan's record is especially probative here, since his 2013 arrest coincided with the seizure of approximately $53,000 in drug trafficking proceeds. The more strikingly similar a prior act is to a present one, the less likely it is that its admission would be prejudicial propensity evidence. *See* Fed. R. Evid. 404(b)(1).

These past acts would be admissible here. First, the nearly identical circumstances of the previous forfeiture—also involving tens of thousands of dollars of cash that was found in a bag in the trunk of a car—serve to establish McClellan's particular method of trafficking drugs. *See United States v. Siegel*, 536 F.3d 306, 318 (4th Cir. 2008) (noting that evidence that establishes a "modus operandi" is "admissible under Rule 404(b)"). And second, the fact that McClellan had previously been convicted of drug crimes—and had forfeited over $50,000 of cash in drug proceeds—helps establish that he had criminal connections who were willing to use him as a courier and who could finance a substantial

22

transaction of drugs for cash. *See* Fed. R. Evid. 404(b)(2) (noting that evidence of past acts may be admissible to prove "opportunity"). The district court noted the "significant probative value" of this evidence, J.A. 118, and it seems odd that the majority would frame an encomium to the jury while at the same time denying that same jury the right to assess a salient item of proof. The grounds for admissibility listed in Rule 404(b)(2) are there for a reason: the most egregious offenders are often ones with highly probative and revealing prior bad crimes and acts.

Despite the highly suspicious circumstances, McClellan nonetheless could have avoided summary judgment by plausibly asserting a legitimate source for the money. McClellan and Silver swore that the legitimate source here was Labelz Stylehouse. But this explanation is belied by Silver's business tax returns, which, as earlier noted, reported a total of only approximately $63,000 in net profits over a four-year period. McClellan had no verifiable source of income during this period, while Silver's income tax returns indicated that her entire income came from Labelz and placed her and her family below the federal poverty line. It is hard to understand how McClellan and Silver could have turned $63,000 in profits over four years into $70,000 in cash while also living off those profits. And while McClellan and Silver now argue that the cash came in part from the business profits and in part from McClellan's inheritance, they adduced no evidence to support this claim, which was inconsistent with their sworn statements that the assets consisted "entirely of profits" from Labelz. S.J.A. 2–3.

As courts have quite logically held, "evidence of legitimate income that is insufficient to explain the large amount of property seized, unrebutted by any evidence

23

pointing to any other source of legitimate income or any evidence indicating innocent ownership, satisfies the burden imposed by the statute." *United States v. $174,206.00 in U.S. Currency*, 320 F.3d 658, 662 (6th Cir. 2003). In fact, McClellan's testimony as to the source of the cash only supports the government's case—both because a history of "limited income[]" is "entitled to considerable weight" in determining whether assets have a legitimate origin, *$252,300.00*, 484 F.3d at 1275, and because "misstatements are probative of possible criminal activity," *$67,220.00*, 957 F.2d at 286.

This case presents as straightforward an occasion for summary judgment as one can imagine. Indeed, the facts as recounted by the majority do much to clinch the government's case. Any reasonable juror would conclude that the cash was more likely than not a product of drug trafficking, and so the district court properly granted summary judgment to the government.

## II.

The majority concludes otherwise. It professes that it is viewing the case against claimants in its entirety rather than picking apart its individual strands. Majority Op. at 17–18. But its opinion simply does not take with sufficient seriousness the totality of the evidence against McClellan and Silver. Rather, the majority proceeds fact-by-fact, examining and rejecting each piece of evidence in isolation, without regard to the picture that the evidence produces as a whole.

The majority strains to concoct explanations for inconvenient facts that make no more than an implausible cameo appearance in the actual case before us. It says that "a

24

reasonable juror could find that the Claimants lied about the source of the cash . . . perhaps to avoid embarrassment or to conceal other illicit activity that would not give rise to forfeiture." Majority Op. at 16. It explains that "[w]hile it may be dubious to drive around with a large amount of cash in one's car, it does not create an inescapable inference of criminal activity." Majority Op. at 17. It posits that "Claimants could have lived frugally while saving Labelz profits, personally used marijuana and used the California card for personal use while in California, and had cash that was incidentally contaminated with cocaine like much—perhaps most—cash is." Majority Op. at 18. These and the train of other speculative inferences do not have a realistic ring. They do not allow claimants to avoid summary judgment nor do they establish an issue of triable fact.

The majority then proceeds to dissect adverse evidence piece by piece, while neglecting its considerable cumulative force. So, for instance, it is true that McClellan's personal use of marijuana, on its own, fails to establish a link to drug trafficking. *See* Majority Op. at 12. It is further true that McClellan and Silver's medical marijuana cards, on their own, may also attest only to their personal use of the substance. *See* Majority Op. at 11–12. It might to the gullible ring true that a bag of cash full of rubber-banded bills of all things, was simply evidence that the owner bore a marked distrust for financial institutions and had no other means of securing loose currency. *See* Majority Op. at 16–17. It might conceivably be true that McClellan's past convictions, on their own, are not dispositive as to *this* given bag of cash. *See* Majority Op. at 8–9. It might possibly be true that the fact that McClellan had crashed into a concrete pillar and passed out from alcohol or drugs, on its own, proves nothing more than very poor decision-making. And it might

25

be imaginable that McClellan and Silver's evasive and implausible explanations for the cash, on their own, do not establish that the cash is traceable to drug trafficking in particular. *See* Majority Op. at 12–16. So while there may be some theoretical possibility that each individual fact is explainable, we should not isolate each fact from the weighty incriminatory context that surrounds it.

Indeed, we may not take each of these facts on its own. To do so is to engage in divide-and-conquer reasoning, whereby courts second-guess each piece of evidence individually without engaging with the aggregate effect of that evidence. This is an all-too-common approach when the record as a whole does not support a particular result. It is easy enough, after all, to nitpick individual facts. The methodology is most common in the Fourth Amendment context, where the Supreme Court has repeatedly admonished courts for employing it. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (stating that, in evaluating probable cause for an arrest, "[t]he panel majority identified innocent explanations for most of these circumstances in isolation, but again, this kind of divide-and-conquer approach is improper"); *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (stating that "*Terry* . . . precludes this sort of divide-and-conquer analysis" in evaluating reasonable suspicion for a stop). But divide-and-conquer reasoning recurs from time to time in all different areas of our law and courts across these different domains have concluded that the approach is improper. *See, e.g.*, *Awad v. Obama*, 608 F.3d 1, 7 (D.C. Cir. 2010) (in evidentiary challenges, "we do not weigh each piece of evidence in isolation, but consider all of the evidence taken as a whole"); *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (in antitrust cases "the courts must look to the monopolist's conduct taken

26

as a whole rather than considering each aspect in isolation"); *United States v. Bloom*, 538 F.2d 704, 710 (5th Cir. 1976) (in reviewing jury instructions, "it is important that they be construed not in isolation, in a piecemeal fashion, but in the context of the entirety of the judge's instructions in the trial taken as a whole").

The reason for this consensus is simple. The innocuous in the singular can become the inculpatory in the plural. For instance, an individual fact may as easily be the product of happenstance as, for instance, of a party's malfeasance. But stack coincidence upon coincidence and at a certain point the explanation collapses. As Justice Holmes stated long ago, "the whole may be greater than the sum of its parts" and one may well decide that a party "should not be allowed to take the bundle apart and break the sticks separately." *Union Pac. R.R. Co. v. Hadley*, 246 U.S. 330, 332 (1918). Many cases, after all, are like Monet paintings: if you stand a few inches away from the canvas, you will see only the individual brushstrokes. But take a few steps back and the scene resolves, without any ambiguity at all, into a garden or a cathedral.

Civil forfeiture cases are no exception. In resolving these cases, we must take a "common sense view to the realities of normal life applied to the totality of the circumstances." *$242,484.00*, 389 F.3d at 1160 (quoting *United States v. Carrell*, 252 F.3d 1193, 1201 (11th Cir. 2001)). In taking that common sense view, I would ask two simple questions. First, why was McClellan carrying the cash? McClellan suggests that he was not trafficking drugs but then he can give no account of his actual behavior—crashing into gas pumps at 6 a.m. on a Sunday morning with tens of thousands of dollars in rubber bands in a bag in the trunk of his car. To say the least, legitimate businesses do not transport money

27

this way: in the early hours of the morning, in wads of cash secured not by currency straps but with rubber bands, transported by a courier too intoxicated to stay awake and on the road. And second, how did McClellan obtain the cash? As noted, McClellan's initial account was hardly translucent. And the explanation that he and Silver ultimately settled on proved totally implausible given the evidence of Labelz' net profits as well as McClellan and Silver's lack of other income.

This intuitive analysis makes clear how anomalous the majority opinion is. For instance, the amicus here cites several civil forfeiture cases where circuit courts have reversed grants of summary judgment or orders of forfeiture. *See* Institute for Justice Amicus Br. at 11–13. But those holdings are sounder and more persuasive than the one in the case at bar. In one, the government seized jewelry that happened to be in "close proximity" to drugs, even though the government could not establish that the claimant's income was insufficient to account for the jewelry. *United States v. Assorted Jewelry Approximately Valued of $44,328.00*, 833 F.3d 13, 16–17 (1st Cir. 2016). In another, the government sought to seize the entirety of the claimant's bank account after seizing drugs at the claimant's home, even though there was no way to distinguish between drug proceeds and legitimate savings deposited in the account. *United States v. Sum of $185,336.07 U.S. Currency*, 731 F.3d 189, 197–98 (2d Cir. 2013). And in the third case, the government seized approximately $30,000 in cash, even though the claimant accurately identified the sum of money and stated he intended to purchase a car with it, and even though the police had no basis for disputing this account. *See United States v. Ten Thousand Seven Hundred*

28

*Dollars & No Cents ($10,700.00) in United States Currency*, 258 F.3d 215, 232–33 (3d Cir. 2001).

In each instance, the claimants could adduce some minimally plausible explanation for what they were doing with the seized assets and how they came to possess those assets. For instance, it is entirely commonplace to keep physical valuables such as jewelry in one's residence or to keep savings in a bank account. The above cases reflect understandable reservations about the overreach of civil forfeiture, but the case before us is anything but the demonstration model that one would choose to advance the cause. Here, despite a litany of facts indicating that the subject money was tied to drug trafficking, McClellan could not provide any reasonable explanation as to what he was doing with that immense amount of rubber-banded cash in his trunk or how he came into possession of it.

None of this is to say that the burden of proof in a civil forfeiture action may shift from the government to the claimant. It is simply to note that, as in any summary judgment case, "the nonmoving party must present 'specific facts showing that there is a genuine issue for trial.'" *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (quoting *Blair v. Defender Servs., Inc.*, 386 F.3d 623, 625 (4th Cir. 2004)). It is not enough to provide "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)*.* So where the government makes out a strong case that the claimant's assets may be forfeited, the claimant is not absolved of the need to rebut that case simply because the government possesses the burden of proof. Where, as here, any reasonable jury would be forced to conclude that the assets at issue are

29

more likely than not subject to forfeiture, the government has discharged its burden on summary judgment.

The Supreme Court has repeatedly repudiated divide-and-conquer reasoning, commanding us not to miss the forest for the trees. Yet the majority wanders through the woods like an arborist, inspecting branches and bark but neglecting to survey the grove as a whole. From a proper vantage point, however, the case is quite clear. Courts must attend to the totality of the circumstances and the overall weight of the cumulative facts, as both precedent and logic command us to do.

## III.

Congress was hardly unaware of public concerns about civil forfeiture. Precisely in response to those concerns, it amended the civil forfeiture statute significantly, eliminating the burden-shifting framework that previously existed and shifting the burden of proof onto the government to demonstrate that the property is subject to forfeiture. *See* Civil Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, 114 Stat. 202. Yet Congress chose not to repeal the forfeiture statute. And, under the current law, the government must meet only the preponderance-of-the-evidence standard familiar in civil cases, rather than some higher burden. 18 U.S.C. § 983(c)(1). The statute that Congress chose limits the government's burden in other ways too: the government may use any evidence obtained after filing the complaint to meet the preponderance standard, *id.* § 983(c)(2), and, as many courts have held, the government need not connect the property to a specific illegal

30

transaction, *see, e.g.*, *United States v. Funds in the Amount of One Hundred Thousand & One Hundred Twenty Dollars ($100,120.00)*, 901 F.3d 758, 768 (7th Cir. 2018).

Congress had good reasons to take this approach. While the seizure of property always implicates individual liberty, it is also true that civil forfeiture remains a tool of great importance for law enforcement in depriving drug dealers and other criminals of their ill-gotten gains. The need is to strike a balance between those competing concerns and the amended statute plainly reflects Congress's desire to preserve the tool of civil forfeiture without compromising the rights of innocent property-owners.

Over the last year, drug overdoses killed 108,000 Americans, the highest number in our nation's history. Noah Weiland & Margot Sanger-Katz, *Overdose Deaths Continue Rising, With Fentanyl and Meth Key Culprits*, N.Y. Times (May 11, 2022). Those Americans most harmed are so often those least advantaged. This crisis, driven in particular by the introduction of synthetic opioids such as fentanyl, *see id.*, hollows out towns and communities, inflicting acute suffering on both drug users and those around them. There is nothing sadder than the sight of an addict always needing the next "fix." This is a crisis for which neither our political branches nor our society at large has found an adequate answer. Yet the solution is not to become so numbed by the persistence of a problem that we weaken the implements that Congress has passed to attack it. Civil forfeiture is one of those tools, a mechanism "to attack the financial structure of drug trafficking" that deprives drug dealers of hundreds of millions of dollars in profits every year. U.S. Drug Enforcement Admin., *DEA Asset Forfeiture*, https://www.dea.gov/operations/asset-forfeiture.

31

I would not undermine one of the essential laws that Congress has chosen to address our country's drug problem. The majority decision, in my view, does not comport with the preponderance-of-the-evidence standard chosen by Congress nor does it align with our long-held principles governing summary judgment. Instead, it subjects civil forfeiture proceedings to a level of divide-and-conquer scrutiny that we do not impose on other civil cases and which finds no justification in the statute. Free from this impermissible approach, what we have is this: an intoxicated driver, with a history of both drug trafficking and asset forfeiture, crashing into a gas station early on a weekend morning with tens of thousands of dollars in rubber-banded bills in a duffel bag in the trunk of his car, with no plausible explanation as to what he was doing with the cash or how he came into possession of that amount of money.

The district court had no difficulty sizing the situation up. And Jackson Pollock would abhor the clarity of this case. I would affirm the trial court's judgment and respectfully dissent.

32